Filed 8/8/16  In re Scott B. CA1/5

Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Scott B., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>Barry B.,<br><br>        Defendant and Appellant. | A145912<br><br>(Alameda County<br>Super. Ct. No. SJ15024375) |

Barry B. (Father) appeals from jurisdiction and disposition orders that declared his son, Scott, a juvenile dependent and removed him from Father's as well as his mother's care.  The court sustained a jurisdictional allegation that Father had a history of substance abuse that placed Scott at a substantial risk of physical harm.  Father complains the finding is not supported by substantial evidence.  We agree; however, the court continues to have jurisdiction over Scott based on the other sustained findings.  We uphold the order removing Scott from Father's care because substantial evidence supports the court's findings that the Agency made reasonable efforts to avoid removal, that no reasonable alternatives were available to protect Scott, and that Scott faced a substantial risk of harm if left in Father's care.

1

## I.  BACKGROUND

Scott, who was seven years old at the time of the dependency petition, lived on property that included a home where Scott's mother (Mother) and her boyfriend (Brandon) lived with their two children (Damon & Raymond), a one-room shed with no running water or plumbing where Father lived, and an uninhabited home with bathroom facilities used by Father.  Father's shed was in clear sight of and right next door to Mother's home.

### A.  *Intervention and Detention*

On February 25, 2015, Raymond, an infant who had been born prematurely, was discovered laying face-down and unresponsive.  Mother and Brandon called for an ambulance, but Raymond had already died.[1]  Scott and Damon were in Mother's home when police and paramedics arrived.  The house was an " 'utter mess' " and extremely cold; the children were dirty, smelly and surrounded by dirty clothes and blankets; and Damon was discovered asleep under a pile of blankets.

Several witnesses described Mother and Brandon as under the influence of drugs: Mother had difficulty answering simple questions, such as requests for her name and date of birth, she mumbled incoherently, and she appeared agitated; Brandon acted erratically, spoke in repetitive sentences, and was unable to sit still.  They were both disheveled and foul-smelling.  Police found suspected narcotics and drug paraphernalia in plain sight and within reach of the children.  Four baggies of suspected methamphetamine, two butane lighters, 10 suspected methamphetamine pipes (some broken or partial), and prescription hydrocodone were collected from the room where Mother, Brandon, Damon and Raymond slept.  Mother admitted a 20-year substance abuse history and drug-related criminal history.  Both Mother and Brandon admitted having used methamphetamine the previous day.  Brandon also admitted a long history of heavy drinking and said he had

---

[1] Raymond's body had no visible injuries, and an autopsy disclosed no evidence of trauma.  Medical personnel described the incident as a possible case of Sudden Infant Death Syndrome.  An extensive police investigation had not resulted in charges against Mother or Brandon as of July 31, when the orders on review were made.  Father was never a subject of the police investigation.

sipped beer the previous day. Scott told a social worker that Brandon " 'likes beer a lot.' " Scott also told police he had never seen Mother and Brandon smoke from a pipe, Mother was a good parent, and neither Mother nor Brandon spanked or hit him. Police reported that Mother's home had "a lot of police history," and both Mother and Brandon initially gave a false name for Brandon.

Father told a social worker on February 25, 2015, that he kept Scott on weekends and sometimes overnight. According to Mother, Father picked up Scott at about 5:00 p.m. the previous day, and Scott returned to spend the night at Mother's house. Father admitted a substance abuse history but said he had been clean for seven or eight years. However, he looked disheveled and unkempt, and he smelled bad. The Alameda County Social Services Agency (Agency) learned that Father had a 17-page criminal history with extensive drug and alcohol charges including driving under the influence and a conviction for battery with serious bodily injury. His most recent charges were in 2005 and 2006.

Approximately nine months prior, the Agency received a referral expressing concern that Damon (then an infant) may have been sexually abused by Father's brother (Uncle), a registered sex offender who reportedly lived with Father off and on.[2] When a social worker investigated, Mother told her that Scott lived with Father and the social worker located Scott with Father. When asked where Uncle lived, Scott pointed to the shed, but Father said that Uncle lived in a trailer elsewhere on the property. Father acknowledged Uncle was a sex offender who should not be around Scott. Father said he had not invited or allowed Uncle to stay there, but Uncle had showed up and refused to

---

[2] The referral also described Mother's home as a known drug house in the neighborhood, and it was alleged that needles had been found in front of the home and marijuana was growing by a creek behind the house. However, Damon, appeared to be well cared for. No action was taken regarding the condition of Mother's home.

leave. Scott disclosed no sexual abuse by Uncle. Father agreed not to let Uncle back on the property, and the Agency apparently took no further action.[3]

The Agency placed Scott and Damon in protective custody pending a detention hearing, and filed a juvenile dependency petition on their behalf pursuant to Welfare and Institutions Code section 300, subdivision (b) (failure to protect).[4] Soon thereafter, the court granted Father presumed father status and ordered Scott detained. Scott and Damon were later placed with a maternal aunt and all three adults received twice weekly visitation.

B.      *Jurisdiction and Disposition*

An addendum to the detention report noted that Father had not returned a social worker's call prior to the March 3, 2015 detention hearing. The jurisdiction and disposition report filed on March 20, 2015, stated that the social worker "saw [Brandon], [Mother], [and Father] . . . in face to face visits" on March 3, presumably after the detention hearing. The March 20 report summarized statements by Mother and Brandon and indicated Father had not provided a statement. According to a July 2015 addendum to the jurisdiction and disposition report, a social worker met with Father, Mother and Brandon on July 10 to discuss the parents' concerns about the children's placement. A "Team Decision Meeting" on similar issues had taken place on May 28, but it is not clear if Father was in attendance.

The jurisdiction and disposition report and addenda document that, although Father "did not initially test as requested," he repeatedly and consistently tested negative for drugs and alcohol from March 6 through July 31, 2015. In contrast, Mother refused to test on February 26, tested positive for methamphetamine on February 27, and thereafter tested negative. Brandon missed several tests and tested positive for alcohol or

_____

[3] In early March 2015, Brandon told the Agency that Father allowed Uncle to stay overnight in Father's shed, but he last recalled seeing Uncle in the summer of 2014. Uncle apparently was arrested for drug possession in May 2015. Brandon agreed not to let Uncle back on the property.

[4] Undesignated statutory references are to the Welfare and Institutions Code.

4

methamphetamine or both on March 4 and 13 and again in May. At the July 10 meeting with Father, Mother and Brandon, the social worker noticed a strong odor of alcohol but apparently could not determine which parent had been drinking and all denied doing so.

An Agency social worker conducted a home visit on July 17, 2015. Mother's home had been straightened up but "still [had] a strong foul odor" and lacked sufficient beds for the children. The social worker reported that she "attempted to see [Father's] home during this visit, but [Father] was at work," and "[s]ince this home visit, [she] attempted to see [Father's] home to no avail."

The Agency recommended removal with family reunification services for all three adults. Mother and Father requested a contested jurisdictional hearing. After Brandon completed part of his testimony, all parties agreed to submit on the state of the evidence. The juvenile court sustained the petition and followed the Agency's disposition recommendation. Regarding Father, the juvenile court said: "[H]e has a history of drug use. He lives in close proximity to [Mother and Brandon]. I believe it is essentially the same property that has two homes on it. But in very close proximity. [¶] And with the fact that there has been and possibly has been very obvious to many people for some time that both [Mother and Brandon] have serious drug problems, the fact that there is drug paraphernalia that has been out in the open in their home, it's hard to believe that [Father] would not be aware of these problems. Yet he has allowed his son to remain in that environment. [¶] He's also allowed his brother, who is a registered sex offender, to have contact with his son. For some reason, at this point, he has not allowed the child welfare worker to have access to his home to determine whether or not his home would be safe for Scott. The Court believes that it would be detrimental to place Scott in his custody at this time and it would also present a substantial risk of harm to Scott." The juvenile court sustained the allegation that Father had a history of substance abuse; declared Scott a dependent of the court; removed Scott from Father's care based on clear and convincing evidence that he faced a substantial danger to his physical health, safety or welfare if left in Father's care; found no reasonable alternative means were available to protect Scott;

5

and found reasonable efforts were made to prevent removal. The court granted six months of reunification services to each parent.

Father appealed from the "07/31/2015 Order granting [Father] but 6 month's Reunification Services on a finding of Dependency, based on 'sibling group' notwithstanding the under 3 sibling is not [Father's] child and [Scott] . . . did not reside exclusively with his mother and sibling."

## II.    DISCUSSION

### A.    *Appellate Jurisdiction*

The Agency argues Father's notice of appeal does not encompass the issues he argues and therefore the appeal should be dismissed for lack of jurisdiction. Father argues the notice adequately communicated his intent to challenge the jurisdictional and dispositional orders and, in any event, liberal construction permits review on the merits. We agree with Father.

A notice of appeal "must be liberally construed, and is sufficient if it identifies the particular judgment or order being appealed." (Cal. Rules of Court, rules 8.405(a)(3), 8.416(a)(2).) This rule does not require the appellant to list the specific rulings in the order that will be challenged on appeal or preview his anticipated appellate arguments. On the other hand, an appeal that is *expressly* taken " 'from a portion of a judgment brings up for review only that portion designated in the notice of appeal.' " (*Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 625.) That is, where the notice of appeal conveys a *clear intention* to appeal from only part of the judgment, the appellate court lacks jurisdiction to review other parts of the judgment. (*Id.* at pp. 624–625 [notice of appeal specified challenge only to "Judgment on the 10th Cause of Action;" no appellate jurisdiction to review judgment on eighth cause of action].)

The first page of Father's notice of appeal states that he is appealing from the "07/31/2015 Order granting [Father] but 6 month's Reunification Services on a finding of Dependency, based on 'sibling group' notwithstanding the under 3 sibling is not [Father's] child and [Scott] . . . did not reside exclusively with his mother and sibling." On page two of the notice form regarding "[t]he order appealed from," Father checked

6

boxes indicating "Section 360 (declaration of dependency)," "[r]emoval of custody from parent or guardian," and "[o]ther orders"; a box specifying "review of section 300 jurisdiction findings," however, was not checked. Father identified the hearing dates for these orders as June 2, July 30, and July 31, 2015, which are the dates of the twice-continued jurisdiction and disposition hearing that formed the basis of the court's July 31 rulings.

Father's notice of appeal is scarcely a model of clarity, but taken as a whole and liberally construed it encompasses all issues he raises on appeal. Page one of the form notice identifies the "07/31/2015 Order," the date on which the court made oral rulings on both jurisdiction and disposition issues.[5] The identification of one specific ruling within the disposition order—"granting [Father] but 6 month's Reunification Services . . . notwithstanding the under 3 sibling is not [Father's] child"—is followed by a statement that Scott "did not reside exclusively with his mother and his sibling." Because the issue of shared custody is not clearly related to the now-abandoned issue of whether Father was entitled to six or 12 months of reunification services based on the age of his child (see § 361.5, subd. (a)(1)(A)–(C)), it could be understood as a reference to Father's general objections to both jurisdiction and removal.[6] Additionally, page two of the form notice indicated that Father was challenging the "declaration of dependency" (i.e., the jurisdictional finding), removal of Scott from his care, and "[o]ther orders." Father's page-two identification of all three jurisdiction and disposition hearings also supports an inference that Father intended to challenge the entirety of the court's July 31 rulings. Considered as a whole, the notice of appeal encompasses all issues Father raises here, and we therefore reject the Agency's argument that the appeal must be dismissed for lack of jurisdiction.

---

[5] The record on appeal includes the reporter's transcript of those oral rulings and a minute order, but no separate written order.

[6] Father argued at the July 30, 2015 hearing that Scott was "not at risk in his care and has never been at risk in his care" and that Father "has not lived in the same residence as the other two parents" (i.e., that there was no basis for jurisdiction or removal).

B.      *Dependency Jurisdiction*

Father argues the juvenile court's order sustaining the jurisdictional allegation that his history of substance abuse created a current risk of harm to Scott is not supported by substantial evidence. We agree.[7]

Section 300, subdivision (b)(1) provides a basis for juvenile court jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." The Agency has the burden of proving by a preponderance of the evidence "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness" at the time of the jurisdiction hearing. (*In re Rocco M.*

---

[7] Because dependency jurisdiction may be based on the conduct of one parent alone, we could decline to address the evidentiary support for the finding related to Father based on his concession that sufficient evidence supported the findings related to Mother. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491 ["[o]nce the child is found to be endangered in the manner described by one of the subdivisions of section 300[,] . . . the child comes within the court's jurisdiction, even if the child was not in the physical custody of one or both parents at the time the jurisdictional events occurred"]; see *id.* at p. 1492.) However, we exercise our discretion to reach the merits of Father's challenge to this jurisdictional finding because of the implications for dispositional orders designed to address substance abuse rather than other possible sources of Father's failure to protect Scott. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763 [review of merits proper where jurisdictional finding serves as basis for challenged dispositional orders, could be prejudicial to appellant or potentially impact the dependency proceedings, or " 'could have other consequences for [the appellant], beyond jurisdiction' "]; *In re J.C.* (2014) 233 Cal.App.4th 1, 4.)

(1991) 1 Cal.App.4th 814, 820; *In re I.J.* (2013) 56 Cal.4th 766, 773.) We review jurisdictional findings for substantial evidence. (*I.J.,* at p. 773.)

Here the petition generally alleged a substantial risk of harm to Scott as a result of failure to adequately supervise or protect him. The petition also alleged a substantial risk of harm by "the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." In support of these general allegations, the petition alleged that Father "has a history of substance abuse which affects his ability to provide care and support for [Scott]." The court sustained the allegations on July 31, 2015. As of that date, evidence of Father's alleged substance abuse problem consisted primarily of his February 25, 2015 admission of substance abuse that ceased seven or eight years prior (i.e., around 2007 or 2008) and his criminal history, which was consistent with his claim of sobriety with the latest reported offense being from 2006. While Father did not initially submit to a drug test as requested, he repeatedly and consistently tested negative for drugs and alcohol from March 6 through July 31, 2015, and he continued to insist he had no current substance abuse problem. The Agency's July 2015 addendum to the jurisdiction and disposition report *inaccurately* reported that, according to pages 12 and 13 of the police report of the February 25, 2015 incident, Father was "observed to be acting erratically, appeared disheveled and was unable to sit still. Deput[ies] also indicated that [Father] appeared under the influence of a controlled substance." In fact, the cited pages of the police report describe Brandon, not Father. On the actual evidentiary record, there was no substantial evidence that Father had a substance abuse problem that placed Scott at a current substantial risk of physical injury. (See *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 [substance abuse alone is insufficient to support jurisdiction].)

Although we shall direct the juvenile court to set aside the jurisdiction finding against Father, the court will not lose jurisdiction over Scott. "[I]t is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child. [Citations.] Once the child is found to be endangered in the manner described by one of the subdivisions of section 300[,] . . .

9

the child comes within the court's jurisdiction, even if the child was not in the physical custody of one or both parents at the time the jurisdictional events occurred." (*In re I.A., supra,* 201 Cal.App.4th at p. 1491.) Father concedes this point.

We observe that the erroneous jurisdictional finding may have adversely affected the progress of this dependency case. As Father notes, his case plan required him to engage only in substance abuse services. (See *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172–173 [error to require substance abuse treatment absent substantial evidence of a substance abuse problem], superseded by statute on other grounds as stated in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1239–1242.) Although Father's case plan objectives also included attentive parenting and obtaining a suitable residence, there was no referral to or requirement to participate in housing assistance or parenting education.[8] Nevertheless, while the apparent mismatch between Father's case plan and the problems that led to the dependency case may affect the juvenile court's future reasonable efforts and services findings, they do not require or permit us to reverse the jurisdictional order.

C.    *Removal*

Father argues the juvenile court erred in removing Scott from his care, and in making the predicate findings that the Agency made reasonable efforts to prevent removal and no reasonable alternatives to removal were available.[9] While we find this a closer issue, we disagree.

---

[8] The only case plan in the appellate record is attached to the March 2015 jurisdiction and disposition report. At the July 30 hearing, Father's counsel told the court that the social worker had told Father he needed to complete "a parenting class, outpatient drug treatment, testing, and showing the ability to maintain the child in suitable housing." However, this representation is not documented in a written and court-approved case plan and the stated plan is not necessarily directed toward the source of Father's problems.

[9] "We note that [Father] has likely forfeited this argument by failing to raise it in the juvenile court." (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 970 [noting general rule that a party may not assert theories on appeal which were not raised in the trial court].) However, the Agency does not assert forfeiture, and we exercise our discretion to consider this claim, concluding that it fails on the merits. We also note that to the extent Father challenges the detention order, the validity of that ruling is moot in light of

10

We review the dispositional order under the same substantial evidence standard of review as the jurisdictional findings. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*In re I.J., supra,* 56 Cal.4th at p. 773.) The burden remains on the appellant to show "there is no evidence of a sufficiently substantial nature to support the court's findings or orders." (*Hailey T.,* at p. 147.) The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. (§ 361, subd. (c)(1).) "Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 918.) "The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child." (*Id.,* at p. 917.) In assessing the need for removal, "the court may consider the parent's past conduct as well as present circumstances." (*Ibid.*)

At disposition, the court must determine "*whether reasonable efforts were made to prevent or to eliminate the need for removal* of the minor from his or her home." (§ 361, subd. (d), italics added.) It must also find by clear and convincing evidence not only that substantial risk of harm requires removal, but also that "there are *no reasonable means by which the minor's physical health can be protected without removing the minor* from the minor's parent's or guardian's physical custody." (*Id.,* § 361, subd. (c)(1), italics added.)[10] As the case law demonstrates, the reasonable efforts and reasonable alternatives findings are linked. (See, e.g., *In re Basilio T., supra,* 4 Cal.App.4th at p. 171 [discussing reasonable efforts and reasonable alternatives interchangeably]; *In re Heather A.* (1996) 52 Cal.App.4th 183, 196 [same].) Reasonable efforts to prevent

the court's subsequent removal order. (See *In re Raymond G.* (1991) 230 Cal.App.3d 964, 967; *In re David H.* (2008) 165 Cal.App.4th 1626, 1633–1634.)

[10] "[W]e employ the substantial evidence test on review. . . bearing in mind the heightened burden of proof." (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

removal often provide the information necessary to determine whether reasonable alternatives to removal are available.

One reasonable effort that must be considered is "[a]llowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (c)(1)(B).) Father implicitly argues he should have been permitted to retain custody of Scott under this provision. We affirm the removal order, however, because substantial evidence demonstrated that Father was either an offending parent[11] or a nonoffending parent who failed to present an acceptable safety plan.

We agree with Father that deficiencies in the Agency reports undermined the reasonable efforts and no reasonable alternative showings. Ordinarily, we would expect a jurisdiction and disposition report, especially one amended a full five months after removal, to include a summary of interviews with the parent facing removal; an analysis of the parent's problems, social history, and family network; a description of the parent's visits with the child; and an assessment of the parent's relationship with the child. Here, the focus of the Agency's investigation was clearly on Mother and Brandon, and much of this information is missing as to Father. Although the social worker "saw" Father in a "face to face visit[]" on March 3, 2015, the March 20 jurisdiction and disposition report indicated Father had not provided a statement and provided no new relevant information about Father. Neither the original nor the July 2015 addendum report describes Father's

---

[11] Nothing in the statute limits "offending" parents to those with sustained jurisdictional findings against them. Because jurisdiction is taken over the child rather than the parents, an agency need not allege and a court need not sustain allegations against all offending custodial parents. (*In re I.A., supra,* 201 Cal.App.4th at p. 1491.) Moreover, section 361 does not require the reasons for removal to be the same as the grounds for continuing jurisdiction over the child. (See *In re Joseph B.* (1996) 42 Cal.App.4th 890, 897–900 [statutes governing status review hearings do not limit grounds for refusing to return a child to a parent's care to those grounds that supported jurisdiction]; *id.* at p. 899 [statutes' focus is "on the child's well-being at the time of the review hearing rather than on the initial basis for juvenile court intervention"].)

visits with Scott or the nature of their relationship, and the Agency reports no services or referrals for Father other than drug testing, even though Father had consistently tested negative since early March. The social worker reported that she was unable to inspect Father's home, but it was not clear that Father was responsible for the delay—although the juvenile court placed the blame for the lack of a home inspection on Father ("For some reason, at this point, he has not allowed the child welfare worker to have access to his home to determine whether or not his home would be safe for Scott"). The only evidence of evasion was Father's failure to return a social worker's call before the March 3 detention hearing and his failure to test when initially requested. Father spoke to the emergency social worker on February 25, 2015 (as well as in May 2014), apparently met with social workers on March 3 and July 10 (and possibly May 28), personally appeared at every hearing, and submitted to testing from March 6 onward.

Still, the evidence before the court indicated not only that Father had failed to protect Scott from risk of harm in Mother's home and in his own, but also that Father remained unable to provide a safe, suitable and habitable home for Scott. A significant undisputed fact is that Father, Mother and Brandon all lived on the same property. Father's shed was in clear sight of and right next door to Mother's home, and Father reportedly cared for Scott on weekends and some overnights, so he inferably interacted with Mother, Brandon and the children. Father picked up Scott from Mother's home on the day before Raymond's death, the same day Mother and Brandon had admitted using methamphetamine and the house inferably was an " 'utter mess,' " strewn with dirty clothes and blankets and reeking of a foul odor. The court, in its findings, made only a single reference to Father's "history" of drug use, and made no reference to current substance abuse. The court instead focused on the "very close proximity" of Father's residence to Mother's, the "serious drug problems" of Mother and Brandon, and the existence of drug paraphernalia "out in the open in their home."

On this record, the court reasonably could have found that Father was aware of adverse conditions in Mother's home on that day and yet failed to intervene to protect Scott. Moreover, in light of Mother's admitted 20-year history of substance abuse (which

13

included years when she was married to Father), Brandon's admitted long history of heavy drinking, and Scott's independent reports of Brandon's love of beer, the court could have reasonably inferred that Father had been aware of ongoing substance abuse in Mother's home for some time. The court expressed disbelief that Father "would not be aware of these problems. Yet he has allowed his son to remain in that environment."

Additional evidence suggested that Father's failure to protect Scott was likely to continue into the future. In May 2014, Father had admitted that Uncle's presence on the residential property posed a risk to Scott and that he had not taken any action to protect Scott from Uncle (e.g., taking Scott away from the property when Uncle refused to leave or calling the police or child protective services agency to intervene), which supported an inference that Father was not adequately protective of Scott in general. Father's disheveled and foul-smelling appearance on February 25, 2015, also indicated a lack of self-care and supported an inference he would also be unwilling or unable to care adequately for others. Moreover, since at least March 2015 Father was on notice that he needed to relocate to an appropriate residence suitable for a minor, with running water, electricity, a toilet, a kitchen, and beds, but at the time of the jurisdiction and disposition hearing he continued to reside in what was consistently described as a "shed" with none of these things. Father presented no evidence he had made any efforts to relocate or sought assistance from the Agency in doing so. The Agency was not required to rehabilitate Father's housing, nor to provide him with relocation services he had not requested.

The juvenile court could reasonably conclude that alternatives to removal had been considered, and that Scott could not safely be returned to his Father's care at that time, and under those circumstances. "We recognize that removing a child from the custody of his or her parent is a 'drastic measure.' " (*In re Miguel C., supra,* 198 Cal.App.4th at p. 973.) "Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest

14

that a state has not only a right, but a duty, to protect." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

### III. DISPOSITION

The jurisdiction finding as to Father having a history of substance abuse affecting his ability to provide care and support for Scott is vacated. The disposition orders are affirmed.

_____
BRUINIERS, J.

WE CONCUR:

_____
SIMONS, Acting P. J.

_____
NEEDHAM, J.